Good morning everyone. We are here for argument on Appellant's emergency motion under Circuit Rule 27-3 for an injunction pending an appeal in the case of Sexuality and Gender Alliance v. Debbie Critchfield. Counsel, Mr. Olson? Yes Judge. You may proceed. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. Kel Olson on behalf of Appellant Salia. I would like to reserve five minutes for rebuttal. All right. Please watch your clock. Will do. Thank you, Your Honor. This panel has already held that SB 1100 discriminates. We appreciate the opportunity to address Appellant's narrow request for injunctive relief during the pendency of appeal, which challenges Idaho's SB 1100 specifically as applied to restrooms at Boise High School. This panel has already held that SB 1100 discriminates based on sex and transgender status because it excludes transgender students from restrooms consistent with their gender identity. So the crux of the issue today is the means ends fit between SB 1100 and an interest in bodily privacy in restrooms. The question is not whether Idaho can maintain separate restrooms, which existed both before and after SB 1100, but how SB 1100 categorically assigns transgender students to those spaces. That is the discriminatory means this Court has already identified and which must have the required fit with the interest. The result, of course, must turn on whether there is a meaningful risk of bodily exposure in the particular facility at issue. This panel already reflected in its previous opinion that context matters. It didn't have to then apply to a specific context previously, but that is the task before the Court today. So we know context matters from the case law that describes the privacy interest at issue. We also know that if we depart from that context-specific test, as we see in SB 1100, we end up with arbitrary and absurd results. Looking at the cases this panel cited to articulate the privacy interest at issue and that defendants rely upon as well, we see that changing the context changes the outcome. So for example, in Sepulveda, we have a parole officer inside a bathroom stall with a person of a different sex while they're using it, and so that was a violation of bodily privacy. But the Court compared a different context. If the person is outside a stall monitoring a shower from a distance where their view is partially obscured, that is not a violation. If you look at a strip search of intimate anatomy, which is what we had in Byrd, that was a violation. But again, the Court compared that to a routine pat-down body search, which was not a violation. And of course, the circumstances are all different, but the basic lesson holds, which is that you can't jump over the facts to do the analysis you have to do now. When you talk about you can't jump over the facts, so is there any record in the District Court as to exactly how things are going right now? That is, where the unisex bathrooms are, how they're being used, what the difficulties are or aren't from their use. School's been going on, what, two months now or so? Or six weeks? But whatever the number is, is there anything that we have in the record as to how things are going on the ground right now? We do have information in the record as to the layout of the buildings, how things are set up. Of course, each day is a day people need to use the restroom, so we don't know for each day what challenges people have today versus tomorrow as they're sitting in class, you know, now. We do have a map of the school buildings that's at docket 90-3. We also have pictures of the stalls in the restrooms and what they look like. That's at 90-4 in the record, and so the court can refer to both of those. And what we see is we have three buildings, one of which has no single-user restroom available that students use for classes, another that has one stall available, and then a third building that has two stalls available, an entire floor, top floor of classrooms with no options, no single-user options, and then one in a nurse's office. The two are one in a nurse's office and one in the corner of the basement of that building through an office. So that's the layout that students are having to deal with at this moment as they're in school. So for example, if you have a student who is in the classroom in building with no restrooms and SB 1100 leaves them with no option that matches their gender identity where they would be safe and where they wouldn't look like they're violating SB 1100 to use it, they would have to go to the next building over, and if that one stall is occupied, they might have to go two buildings away. Great. Could I ask a follow-up question or maybe to counsel, since you're on the floor plan, what I call it, exhibit. On my end, at least, it's pretty fuzzy, and I wanted to ask a question. I read this, putting them together with the declarations, that on the main building on the basement at the end of the hallway right near the art room, there's one of the bathrooms. I think that's the one you're mentioning. And then on the main on the second or third floor of that building, and I think the second and third floor of that building pretty clearly has classrooms. Yes. In fact, that's not a question. I can tell that. But in the church building, the Frank Church building, the second floor, I don't see any alternative bathrooms in that building, but I can't tell whether there's classrooms in that building. Right. My understanding is there are classrooms in that building. I don't know if that's clear in the record, but that is my understanding is that students do use that building for classes. Okay. So maybe we can hear from opposing counsel on that when we get that far. My related question is, from the declarations, it's a little unclear to me whether a student has to have a key card that's programmed to have access to get into the bathroom or the restroom by the gym and or the art room. Do you know that? Is that in our record? I do not know that about the art room, because that is one that students were less familiar with before this came about, because that's through an office area as well. But I do know that, at least previously, there was key card access required in the gymnasium stall. Now, is there key card access required for the buildings themselves or the classrooms or anything else? I'm not aware of that, Your Honor. I'm not aware if they need access for the general building. So are the students, I mean, is the key card something that's exceptional just for the restrooms, or is it something that all the students have? I don't know that answer, Your Honor, as to whether they have an existing card that's used for other purposes and it can be specifically programmed for that bathroom or whether they are the only ones carrying that card. So what is the very, can you state very specifically the harm that your clients are facing by this statute? Yes, Your Honor. So there's, of course, per se irreparable harm for a violation of constitutional rights. But in addition to that, experts on both sides below agreed that restroom access is necessary for learning and that impeding access causes lasting harm to students. That's Dr. Spudge and Nanjia both acknowledge that truth and that this type of harm, because it cannot be remedied, as I mentioned, by separate facilities. You have, first of all, the logistical problems that I mentioned before, as far as the limited availability. First of all, as a legal matter, to be clear, having those separate facilities cannot justify the law. Idaho has to first justify how they've sorted students. If you have to avoid applying the rule altogether by sending students elsewhere, that should set off alarm bells under any level of scrutiny, especially heightened scrutiny. But as a matter of harm, forcing students to use those separate facilities does not mitigate. And the evidence in the record is that it actually exacerbates harm because you're forcing students to use separate facilities. Very different than the status quo, which, of course, allowed the option of separate facilities and which is part of the relief we would, you know, continue to ask for. But telling people they must use separate facilities because of who they are and to have the state tell them that is a very different harm. And it reinforces the stigma that you must go elsewhere. And of course, people, these students are spending most of their waking hours every day of the week on this campus. To imagine they're not going to have some urgent need at some point over the years they spend there and have to run to the nearest facility and to have the school say, now you have to run into the facility that doesn't align with your gender. It's going to look like you're violating SB 1100 by doing that, which shows the absurdity of how this is set up. And when you do that, the only way, you know, a school is going to be able to defend against that $5,000 penalty and attorney's fees is to essentially out the student. I don't counsel you. You've said at page two of your motion for injunction pending appeal that the injunct because you're just talking about outing students and your injunction says we narrowly sought a preliminary injunction limited only to restrooms and only to saga members at Boise High. That is the same limited injunction plaintiff now seeks from this court appeal. If we were ever to get there and consider granting this, how would that work? You're asking for an injunction limited to restrooms and only to saga members. What would an injunction say that would give the school fair notice of what conduct was prohibited given what you're asking for? Yes. In this record, we have a clear record of how the status quo worked. So if we look at the record at pages, our addendum at pages 264, which is the school Idaho School Board Association model policy, and then page 303, where Boise High School or Boise High School District describes its approach, says that a student has to go through an intake process, complete a gender support plan. So maybe I'm not asking a good enough question. You said limited to restrooms. I don't think that would have much problem and own limited only to saga members. That's what you have said your injunction would be. So how would the school know who was covered by the injunction? How would the school know who saga members were? Thank you, Your Honor. So because Boise High School would have an intake process, referred to on page 303, and we assume they would follow that same process as they did before SB 1100, a student would have to come to the school, ask for this permission, show that they say, I am a saga member as part of that process, and then they have to make these additional showings. They have to meet with the school, have their parents sign off, and show that they consistently and persistently have this gender identity for a period over time, and that they're only seeking access according to that gender identity. So there would be some people who would be identifying themselves to the school and a number of personnel at the school as a saga member? Yes, Your Honor, and we think it's consistent with the status quo that they have had to go to the school, identify themselves and ask for permission. And I think you've, your readings are clear that to be a saga member, you don't have to be transgender or LBGTQ. Anybody can be a saga member? Correct, Your Honor. And to qualify under the status quo, they have to meet additional requirements. They have to be a transgender student to qualify under the status quo. So it would only, in practical effect, be granting relief to transgender members of saga that meet the school's intake process and criteria for the gender support plan. I didn't see that in your motion in terms of the relief you were seeking, but you've clarified that. Absolutely, Your Honor. Yes, it would apply to transgender members of saga who qualify under the status quo plan. Counsel, I think you make a strong argument that, or maybe I'll just take it as an accepted for purpose of a hypothetical, that a student who is transgender would suffer harm if forced to use a bathroom that did not align with their gender identity. So if I accept that, then of course SB 1100 doesn't require that. It requires either that or that they use an alternative bathroom. So for this hypothetical, what I'd like to engage in is what does our record show about how available those bathrooms are? There's one possibility that the bathrooms are available, at least on the floor plan, but not on a day-to-day basis because they're located in areas that are too remote. Or there's another possibility to follow up, but I think I want to judge Wardlaw's questions about requiring a key card. What's it really take to use these? Are the students going to be late? And the principal's declaration indicates that cisgender students can use these bathrooms as well. So I'm trying to figure out everything from how accessible are they? What do we know about that in the record? And also whether or not a student would be outed by using that bathroom. I would take those harms very seriously, but I'm not sure I have the record that tells me the answers either of those questions. I've got the floor plans. I've got the two declarations of the students. I've certainly read those, I'm sure my colleagues have, and the declaration of the principal. But the situation we're in is that all the declarations were, of course, executed at a time when we were anticipating the school year. And SB 1100 had never been in operation. So as Judge Bennett indicated, now it has been for a couple of months. And so I'm wondering about whether we need a limited remand, whether that would be helpful to be able to show the final winter factor is whether your clients face irreparable injury. One, I think the easiest showing of irreparable injury, the most tangible would be the very personal fact of being transgender. Because once that's secret, for some students, I think that would be secret and private information. Once that's out of the bag, it's out of the bag. But I can't tell from this record whether that's happening. So could you speak to that? I'm not sure I have a specific question there, but that's my problem. And I want to give you the best chance to respond to that. Yes, Your Honor. We think we have enough information in the record to show the limited availability that we're talking about. Three stalls spread across three buildings in a school with over a thousand people, that bathrooms are remote. And by definition, when you go to the second building, if you're in that first one without a bathroom, there's one stall. So the chance of that being occupied is higher. And I don't think we need more evidence to show that And then we have the fact that restrooms are located in various places with various stalls. If you're a cisgender student, you're going to have dozens of stalls because people have urgent needs. And this is a place where people are spending their entire day. So I think that is a fact the court can recognize and have before it. The note from, again, because the experts below agree that restricting access impairs learning. We already have that evidence in the record. There's no real dispute there. And the principal's declaration in the record shows that counselors could have discretion to excuse people being tardy over and over for this, but again, did not try to say that they wouldn't be or that it wouldn't impair their learning. So I think there's plenty of evidence in the record for that. And I see them running low on time. I just have a couple of follow-up questions quickly. Forgive me for interrupting. Do we know how many students are members of SAGA? We don't know how many students are members of SAGA this year. We have a limited amount in the record as far as declarations. Okay. So I'll take that and just try to move on quickly here. Do we know how many cisgender students are using the single user facilities? We do not know that, Your Honor. Do we know that they are using, cisgender students are using them? I know that the Do we have anything that says that's happening? We don't have any confirmation of how many people are using it. We do know under the status quo policy and the Idaho School Board policy at Addendum 264 that what they suggest and what would be permitted under status quo is for anyone to be able to use those that have a need. Right. Okay. Thank you for your patience with the questions. Thank you, Your Honor. All right. We'll give you some extra time if you need it, Mr. Olson. And we'll hear from counsel for Ms. Critchfield, Mr. Hurst next. Thank you, Your Honor. May it please the court, Alan Hurst on behalf of Superintendent Critchfield and the other appellees. I think I'll start by addressing some of the record questions and the irreparable harm questions that the court's been raising. And then from there, I would like to say that, yes, we have a very limited record. We don't know, as I think has been admitted, how many SAGA members are transgender and would be taking advantage of an injunction like this. He talks about the harm of these members being outed. We don't know whether any of them are not already outed. This is not something that exists in the record for us to be able to know about. Another key fact that I think can't even be fixed by a limited remand is that the statute does not actually say, here is the accommodation. It has to be these other restrooms. What the statute says is there is a process. If you are a person who does not feel comfortable using the multi-occupancy restroom assigned to your sex, then you can submit a request for reasonable accommodation in writing. And the school has an obligation to provide you with a reasonable accommodation. To my knowledge, no such request has been made. We don't know what the school's accommodation will look like once the request has been made in writing. Perhaps it's the case that the school, based on the written request, determines that the Frank Church building that does not have a single occupancy restroom, that that's not an adequate reasonable accommodation. In that case, the school would have a duty to come up with some other accommodation that would be reasonable under the statute. And because the school has that duty, I don't think the Frank Church, at least at this point in the proceedings, I don't think the Frank Church building can be a justification for an injunction against the whole statute. We need to see how the statute works in this case first. Are you representing, and I'm sure you have information, and we were also asking your friend what his information was, but are you a reasonable accommodation, or are you just saying you don't know of anything in the record that suggests that that happened? I can't say that I've been relatively recently told that, no. But I don't know of anything in record that says that's happened, and I don't have any other out-of-the-record information that suggests that's happened. So it's possible that it has happened? Yes, I can't say with complete certainty that it has not happened, but it has not happened in the record. So I'm going to follow up your statement about harm and the harm of being outed, and you said it's not clear. Perhaps Saga members have already been outed, but I'm wondering if that means you're limiting the state's acknowledgement of harm to being outed as opposed to the expert testimony declarations that we have here also discusses the harm affiliated with being treated differently, or ostracized, or just being forced to use a different facility. I acknowledge there's discomfort there. I acknowledge that especially there's certainly harm if people cannot find a restroom in time to use it, and then the dust, the search for a restroom, would interfere with their educational endeavors. I don't think anybody disputes that that would be a harm. Like Your Honor, I'm not convinced that we have a that is happening in this case. Beyond that, as far as the record and the experts, you know, we do have some disagreement among the experts. Our expert thinks that the single occupancy restrooms are the best solution for transgender identifying students. So anyway, yes, we need more record. We don't know how this is playing out on the ground because the appeal was filed before the school year began. A minute ago, one of you, perhaps as a opposing counsel, indicated there's a thousand people at this high school. Do you know where that is in the record? I do not, Your Honor. Okay, so could you talk to me a little bit about availability? It's sounding like I don't hear you pushing back on the premise that if a transgender student were indeed forced to use a bathroom, a restroom that did not correspond with their gender identity, that there'd be a harm there, at least for purposes of this argument. I don't hear you require that. Well, so maybe the premise is, did I interrupt you? Are you pushing back on that? Oh, no, I agree. Forcing someone to use a restroom that they're uncomfortable with is a harm to that person. The problem, of course, is that the transgender individuals are not the only people who might be made uncomfortable. You know, transgender people are diverse. Some of them do successfully pass as the opposite sex. Some of them do not. Some of them don't try. We don't know, you know, how members of the opposite sex will feel on the arrival of these transgender people in the room. They may be made to feel uncomfortable. That is a harm, too. It weighs on both sides that way. I'm sorry. Go ahead. Go ahead, Judge Christian. Thank you, Judge. I was just going to follow up to say that I'm accepting that, that this is a complicated situation for school educators. And the SB 1100 doesn't require someone with a male appearance to walk into a women's bathroom. It doesn't require it. But it is why it seems to be really critical from a constitutional perspective that we make sure these bathrooms are indeed accessible and truly available in every sense. And that would include students being able to get to class on time and knowing that there's enough of them to handle the number of people who need to use them. That was my only point. I think I interrupted Judge Wardlaw. No, I'm sorry. I didn't realize you had a follow up. It's hard. We're all hearing by video to know, you know, no cues. So my question is, though, with the status quo being what it is, is there what evidence is there of harm to the other students? Because my understanding of the status quo is that students that are members of SAGA are already allowed to use the restroom of their gender identity. So is there evidence of harm to the students that's in the record? At least we do. Sorry, Your Honor, excuse me for talking over you. No, I'm just trying to clarify my question. We do have the AC declaration, right? We do have this event that happened at Boise High School last year where exactly what happened is disputed. But what is not disputed is that there was extremely uncomfortable interaction between two students that I think affected both of them for the worst. So we know about that one. We don't know if there are others. I don't think that we can say with confidence that there are no problems in the status quo. Well, the status quo right now, though, is the statute is in effect, right? That's correct, Your Honor. And I mean, not to keep going back to this, but we don't know how that new status quo has worked on the ground or has affected either cisgender or transgender students. And we don't know what additional accommodations might be made if it's determined that the present accommodations are not reasonable under the statute. Counsel, I think the district court didn't make these this finding. He didn't go there. He talked about a minor harm, and I guess I would push back on that. But he thought the harm wouldn't be irreparable. And the district court cited page 925 of Roe for the proposition that the Ninth Circuit has already held that this alternative accommodation is valid and will not otherwise out a person of transgender. We didn't hold that in Roe. What I don't know is whether or not perhaps there's confusion because was that argued? Did the counsel below argue to the district court that Roe made this holding? I'm afraid I can't answer that, Your Honor. I don't know the answer to that question. Okay, so maybe it's just a misunderstanding. But since we haven't reached that, and I don't know how we could have, because we didn't have at that point even the floor plan, much less a declaration of true. We just had a total void about the on the ground reality. So it seems to me that our district court, who has labored over his case, um, missed making this finding. And I don't know what he would have decided had he had an occasion to hear the evidence and decide about the availability of these restrooms. My recollection is that the district court's ruling on this point was also motivated by a citation to the statute, like the accommodation provision. And so I think the district court looked at the statute and said, well, a reasonable accommodation must be necessary, and therefore, if the statute is in effect, they won't be significantly harmed, because if they were significantly harmed, then it wouldn't be a reasonable accommodation. I think that's fair. That might have been what the district court meant. And if you're talking about the harm, or sorry, the state's interest being, you know, the bodily exposure concern that we talked about, that our panel certainly talked about in Roe, and the state was advancing, when we were looking at a facial challenge, when we were considering showers and bathrooms and whatnot. Right. Today, we're looking at bathrooms, just restrooms at Boise High School. So does the state have a different interest today that is broader than the concern about bodily exposure? I think that the state has a strong privacy interest, Your Honor, and thank you for the redirection to the merits, which I would like to talk about a bit. And I, you know, if I'm asked, you know, where is the evidence of the record of the privacy interest, I'd direct the court's attention to the restrooms, right? To begin with, look at the layouts is what I would say, you know, to begin with, they didn't have to create separate boys and girls rooms when the statute was passed. They already had them. There was a reason for that. Next, you look at the layouts of these restrooms, and you can see that they are all set up in such a way that you can't see the toilets from the hallway, even when the stall doors are open. Sometimes they have an extra door that obscures the, excuse me, sometimes they have an extra wall that obscures the doorway from the rest of the restroom, even the common areas. For a few of the girls restrooms, there are actually two doors that you have to go through from the hallway in order to get into the girls restroom. All of these things, to me, suggest that there is an interest in privacy that has always existed in these spaces, and that the architects have always understood this, and essentially everyone has always understood this. Also, on these diagrams, you'll see that all of the men's restrooms have urinals in them, which means that in half of the restrooms we're talking about, the district court is exactly correct that people are in a state of partial undress without a stall around them. Well, as far as we can tell, there are dividers along between the urinals, but if I could ask you to perhaps just refer back. I wasn't meaning to direct you to the merits. I was actually trying to get at, forgive me, but I'm actually trying to follow up on the district court's idea about what the harm is. He referred to this as a minor harm. I mean, in fairness, at the time, the state had been advancing its interest in describing it as an interest in preventing bodily exposure. So, if that's what the district court had in mind because that's the harm or the interest the state was advancing, then using an alternative facility, I think, clearly would alleviate that concern. There's not going to be any danger of exposure, but there's this other harm that we don't have any findings about, and that's a harm, at least for a while, that you and I have discussed. The harm of outing and the harm of being treated as being shunned, you know, consistent with the experts' declarations. We certainly have evidence of that, and that wouldn't be addressed at all. In fact, it might be exacerbated. We don't know. We just have declarations that anticipate this will be a problem. You see what I mean? Yes, I understand that entirely. I would point out this feeling of being excluded and shunned might also apply to the students who would feel uncomfortable in these restrooms if the injunction is granted. And in this court's parents for privacy case, you know, where you had the opposite side, right? You had the parents suing to prevent the kind of policies that Mr. Olson is arguing for, and this court said effectively, well, the other restrooms, like the single occupancy restrooms, they work. That's good enough. If it's good enough for them, then I think that's at least like a prima facie showing that it's good enough for anybody. Well, it is the flip side of the coin, though. Those cisgender students did not voice concern about being outed. I'm not trying to prevent you from talking about the merits if you want to, but I just want to explore the state's position on those points. Okay. Can I just ask, Mr. Hurst, are you arguing, you're not arguing today that the existence of these three restrooms are in fact a reasonable accommodation, are you? I don't think I am able to say that on this record. It has not been tested. You know, the request has not been made to my knowledge. But I have to, the District Court had to assume that that was a reasonable accommodation to reach the ruling it did, correct? I'm not certain of that. The District Court may simply have concluded that a reasonable accommodation must be made available, and therefore the District Court could assume that one would be made available, or the District Court may have determined simply that there was not a sufficient record to show that the accommodation was unreasonable. Those are other interpretations of the Court's order. Because the record does show there are these other bathrooms, and that there's a requirement that if someone doesn't think they're, in the statute at least, that if someone doesn't think they're reasonable, they have to request something else. Correct, Your Honor. Okay. Seeing no further questions on this topic, I would like to use the remainder of my time on the merits. To me, I'm grateful to hear Mr. Olson agree that separate boys' and girls' rooms are constitutional, legal, that that's not what this case is about. And I'm grateful to hear him say that they're seeking a narrow injunction and not something that would apply to the entire state. My concern is that I don't see the legal theory that would stay narrow. I don't see the way that a ruling that, well, let's put it this way. Under equal protection, Mr. Olson's argument is that this is both a sex-based and a gender identity-based classification. It fails heightened scrutiny under both of those prongs because the state has no privacy interest in those stall, excuse me, in the restrooms once you put the stalls up. But if that's the case, once you put the stalls up, what's the state's interest in dividing the restrooms to begin with, right? It seems to me that there are three options. Either heightened scrutiny is satisfied, or heightened scrutiny doesn't apply, or all the restrooms have to be unisex. And I haven't heard an argument from Mr. Olson that distinguishes that and explains why that's not true. On the Title IX side, it's the same thing, right? Their argument isn't that Title IX prohibits gender identity discrimination. Their argument is that they are being denied access to a particular restroom on the basis of and that that constitutes sex discrimination under Section 1681. But if that's sex discrimination under 1681, and if restrooms are not living facilities under Section 1686, then nobody can be denied access to a restroom on the basis of their sex. And once again, the conclusion is we have to have unisex restrooms, which I think is why the court said, you know, footnote 15 of the Roe opinion, right, that this is not what the statute meant, you know, that at the time Title IX was passed, it was so assumed that restrooms and locker rooms and showers would be, you know, would be separated, that it did not merit special mention in the text of the statute. So that would be how I would lay this out, is I don't see the way to rule for them on these theories and still leave the school able to maintain separate boys and girls restrooms as it has always done. Let me take a moment here. Beyond that, I think that the school, I think that the court shouldn't, I would discuss the interest in privacy. I think the court also shouldn't discount the interest in safety. We have no desire, no intention to accuse transgender people of being particularly likely to commit acts of violence or voyeurism or the like in restrooms. On the other hand, you know, people who go into that restroom don't know whether the person they're seeing is transgender. We cite a number of cases. There's one news article on Breeze that talks about six cases where men have dressed up in female attire and gone into the restrooms, used that to get access to the restrooms and then committed acts of voyeurism inside the restroom or the locker room or what have you. A male student could do that right now. The difference would be that. The means to end fit is really tough for you on the safety argument, counsel. All right. What's your best shot? Because I am very skeptical. Okay. The means to end fit is that if that happens now, nobody knows that he's not supposed to be there. Basically, right? If that happens now, excuse me, not now. If that happens under an injunction, nobody knows he's not supposed to be there. If that happens with an injunction where the law is not in effect, a girl going into that restroom does not know that that restroom is an unsafe place to be because of this person's presence. The girl will assume this person's been cleared by the school. This person is allowed to be here. So it's maintaining the separate spaces allows people to feel safe. It's not merely an interest in actual physical safety. It's an interest in perceived safety. Because if, again, leaving the transgender issues out of it, right? If all the bathrooms were made unisex tomorrow, the result of that would be that girls and not boys would sometimes fear for their safety in restrooms. And that would be a detriment to the educational experience of girls and not boys. So maintaining these separate restrooms, I mean, we cite an article in our brief, right? That separate women's spaces like this are, in fact, a civil rights triumph that have enabled women to succeed in a variety of areas in education, in sports, and so on. And that without those spaces, people will be hurt. Whether that's safety, whether it's privacy, whether it's simple feeling comfortable at school and being able to succeed, the people affected on the other side of the injunction have those interests the same way that the people who would benefit from the injunction have. And as the court has discussed, I don't think we have a record on which we can determine which of those harms would outweigh the other. Seeing no further questions, I thank your honors for your consideration, and I ask that the injunction be denied. All right. Thank you, counsel. Mr. Olson, you may conduct your rebuttal. Thank you, your honors. Taking that last point first, I agree there's no basis to find that there was clear error in the court determining that safety evidence was insufficient, was unclear, exaggerated, or speculative. Respectfully, Mr. Hearst is simply wrong as to how this would play out under the status quo. Someone who is johnned during math class is also johnned when he goes to the restroom. Under SB 1100, his gender has to switch when he goes in if he has an urgent need. So it completely has the opposite absurd results. Regarding whether defendants have provided enough evidence to say that there is no harm because of a separate restroom and therefore you don't even have to look at the discriminatory classification in the law, they simply have not done that. They've had an opportunity to do it. We have plenty of evidence in the record that there is significant harm. In the context of civil rights, sending people to separate facilities has never been the answer, and it should not start here. There is significant injury. We have evidence from multiple studies below that the lasting harm it sends, it's very different to have the choice to go to a separate facility as an because of who you are. And on your way down that hallway to get there, you pass a girl's room that the state has pasted a message underneath that says, but not you. That is very different than a student in Parents for Privacy getting an additional option to use a room and being able to still have that fallback option when they need it. And Parents for Privacy is very important here because it found there was no plausible privacy interest. It was a dismissal, affirming a dismissal, no plausible privacy interest when you have two users of a restroom, one transgender and one not, no privacy interest implicated. So here to say that there is also at the same time an exceedingly persuasive justification to separate those students by barring all transgender students is very difficult to reconcile with Parents for Privacy, even with the different posture there, because it deals with this context. And as I mentioned, this context is what really matters, is these two users using restrooms for their ordinary purposes, who both have a right to be there. We do have additional evidence in the record from Daisy Davis's declaration that using separate facilities in the past caused her problems. We have evidence from Jane Doe talking about her process, trying to avoid the restrooms until she could qualify because she was far enough in her transition and what that did to her. There is plenty of evidence in the record to show that this is a daily harm and that we have a strong showing to provide relief in the interim while this appeal continues. On the title, well, I see I'm about out of time. If you would like me to address the title. I'll give you another minute or so, but I'm interested in your position. So your position is that these three bathrooms are not a reasonable accommodation. They do not mitigate the harm. They definitely do not eliminate the harm and they can't avoid, defendants can't avoid the test altogether by just assuming no one's ever going to use the classification they've put in place. So I think first we have to keep the legal test, whether they can justify sorting the students the way they have from the measure of harm, where single use comes into play. And it certainly, there's plenty of evidence that sending people, forcing people to go elsewhere based on their status is increasingly increasing the damage and not solving it. And so you, you would know this, even if your friend didn't have any of the individuals who are saga members made a reasonable accommodation filing. Submission under, under SB 1100 this year. Are you speaking of? Yes. Yes. I believe the between the status quo and what we have now is they would have had that additional option as needed if they weren't having an urgent need already and probably already have that in place. The difference with SB 1100 is now if they have to go to the multi-user for some reason, now they have to go to the one. No, no, my, my, my question was more specific. Your friend has talked about how the statute allows for a specific request for a reasonable accommodation. I think in writing, have any of the individuals who would be protected by the injunction you're seeking filed or submitted such a request in writing? I presume they would have continued their pre-existing request, which is to use those single facilities that have existed previously and still exist. And briefly, your Honor, on the Title IX issue, I disagree with, with my friend on the other side, that finding for plaintiff's reasoning, which is very much consistent with Bostock and the other circuits on this Title IX issue that have found this a violation and that it does not lead to anyone being able to use any restroom because there would not be the facility that would be threshold showing of discrimination someone would need to have unless they were in a position where they weren't able to use a restroom that is consistent with their gender identity, which this circuit has held, is not something that can be changed or forced into consistency without extreme harm. And whether or not Congress anticipated this application is also an issue squarely addressed in the same reasoning used under Bostock. And of course, in this circuit, we look at interpreting Title VII and IX consistently in that way. Not thinking about looking at Congress's silence around whether you can separate restrooms in the first instance is not an opportunity for the court to add an ad hoc exception, which is something Bostock talks about along those same exact lines. Instead, the appropriate way to think about it is that this is perhaps an unintended consequence. And Bostock starts out with the first two sentences all the way through and at the end saying with this type of statute, that's exactly what happens. It's practically guaranteed to happen. And what the court said there is our job is still to just apply the text as it is. Assuming sex means nothing more than sex assigned at birth, this has already found that SB 1100 discriminates based on sex. And so if it's not carved out by the statute, then it is covered under Title IX. And so the only narrow finding the court would need to find there if it went to Title IX, and we don't think the court needs to, we think there's a straightforward basis for relief under equal protection. The court could do what it did in that restrooms in particular are not living facilities and therefore it's not carved out from the clear text regardless of the definition of sex. Do you want to sum up counsel? I'm sorry, I did not notice my time was counting up instead of down. My apologies. Yes. So thank you for your time. Very much appreciated. And with that, appellant would request and urge the court to grant injunctive relief pending appeal. Thank you very much, counsel. And thank you both for your excellent arguments today. We will take this case or take this motion under submission. And this session of the court is adjourned for today. Thank you.
judges: WARDLAW, CHRISTEN, BENNETT